## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| RUDONNA LEGREE, and | : | |
| JUICY REID-STITH, | : | |
| Plaintiffs, | : | CIVIL CASE NO. |
| | : | 3:22-CV-00659 (JCH) |
| v. | : | |
| | : | |
| CITY OF WATERBURY, | : | |
| JOHN DOE, | : | |
| DAVID TERNI, and | : | |
| STEVE GILMORE | : | |
| Defendants. | : | AUGUST 28, 2024 |

**RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DOC. NO. 39)**

## I.      INTRODUCTION

Plaintiffs Rudonna Legree ("Ms. Legree") and Juicy Reid-Stith ("Mr. Reid-Stith") (together, "the plaintiffs") bring this action against the defendants, the City of Waterbury, John Doe ("Officer John Doe"), David Terni ("Officer Terni"), and Steve Gilmore ("Captain Gilmore") ("together, "the defendants"), under section 1983 of title 42 of the United States Code and Connecticut state law.  See Amended Complaint ("Am. Compl.") (Doc. No. 21).  The plaintiffs allege that the individual defendants, all of whom are law enforcement officers of the Waterbury Police Department ("WPD"), arrested them at a racial justice protest in violation of their constitutional rights.  See id.

Before this court is the defendants' Motion for Summary Judgment.  See Defendants' Motion for Summary Judgment ("Defs.' Mot.") (Doc. No. 39).  The plaintiffs oppose the Motion.  See Plaintiff's Memorandum in Opposition ("Pl.'s Opp.") (Doc. No. 45).  For the reasons set forth below, the Motion is granted in part and denied in part.

1

## II.    BACKGROUND

### A.    Factual Background[1]

On May 31, 2020, days after the death of George Floyd in Minneapolis, Ms. Legree attended a racial justice protest in Waterbury, Connecticut.  See Plaintiff's Local Rule 56(a)2 Statement of Facts ("Pl.'s 56(a)2 Stmt.") ¶ 1 (Doc. No. 44); Defendants' Local Rule 56(a)1 Statement of Facts ("Defs.' 56(a)1 Stmt.") ¶ 1 (Doc. No. 39-1).  Ms. Legree listened to speakers, kneeled, marched through downtown Waterbury, and, along with dozens of others, made her way to the Waterbury police station.  See Pl.'s 56(a)2 Stmt. ¶ 2, Defs.' 56(a)1 Stmt. ¶ 2.

Mr. Reid-Stith was a passenger in a car that morning that was blocked by protestors on East Main Street in front of the Waterbury Police Department.  See Pl.'s 56(a)2 Stmt. ¶¶ 22-23; Defs.' 56(a)1 Stmt. ¶¶ 22-23.  The driver of the car parked it across the street from the Waterbury Police Department, and Mr. Reid-Stith exited the vehicle.  See Pl.'s 56(a)2 Stmt. ¶¶ 24, 30. Defs.' 56(a)1 Stmt. ¶¶ 24, 30.  Mr. Reid-Stith walked in the direction of the police station, following and observing the protest as it arrived at the station.  See Pl.'s 56(a)2 Stmt. ¶¶ 26; 31, Defs.' 56(a)1 Stmt. ¶¶ 26, 31.

The defendants assert in their Affidavits that "a number of the demonstrators were physically within the traveled portion of East Main Street" and were "obstructing the flow of vehicular traffic."  See Def.'s Exhibit 4 at ¶ 5 ("Gilmore Affidavit") (Doc. No. 39-6), see Def.'s Exhibit 3 at ¶ 5 ("Terni Affidavit") (Doc. No. 39-5).  The plaintiffs argue, based on two aerial photographs, that there were a "manageable amount of people in

---

[1] The court draws primarily from the parties' Local Rule 56(a) statements and supporting exhibits in summarizing the material facts.  As it must, the court construes all disputed facts in the light most favorable to the plaintiffs, the non-moving party.  It also notes where the facts are disputed.

the street." <u>See</u> Pl.'s Exhibits C & E, Screenshots from Aerial Drone Footage of the Protest (Doc. Nos. 44-3, 44-5), <u>see also</u> Plaintiff's Statement of Additional Material Facts ("Pl.'s AMF"), at ¶ 11.  It is undisputed that, in response to the protest, the WPD called in its Field Force Unit, Emergency Response Team, and Street Crime Units, and that these units assembled at either end of East Main Street.  <u>See</u> Pl.'s 56(a)2 Stmt. ¶¶ 58-59, Defs.' 56(a)1 Stmt. ¶¶ 58-59, <u>see also</u> Pl.'s Ex. E.

The parties dispute whether police gave warnings before making arrests. Officers Gilmore and Terni testified that the protestors in the street were refusing to disperse despite orders to do so, and they continued to block traffic.  <u>See</u> Def.'s Exhibit 4 at ¶¶ 6,7 ("Gilmore Affidavit") (Doc. No. 39-6), <u>see</u> Def.'s Exhibit 3 at ¶¶ 6,7, ("Terni Affidavit") (Doc. No. 39-5).  Specifically, defendants testified that Captain Gilmore issued at least three warnings to disperse using a "Long Range Acoustic Device" which was sufficiently loud for protestors to hear.  <u>See id</u> at ¶¶ 9-10.  However, Ms. Legree testified that she never heard any announcement telling people to move out of the street, despite being present at the time of the alleged warnings.  <u>See</u> Pl.'s Ex. B. (Doc. No. 44-2), Def.'s Ex. 1 (Doc. No. 39-3) (together, "Legree Deposition") at 75.  Mr. Reid-Stith testified that he did hear a Waterbury Police Officer on a horse yell, "everybody get out of the street! Anyone in the street will be arrested."  <u>See</u> Pl.'s Ex. D. (Doc. No. 44-4), Def.'s Ex. 2 (Doc. No. 39-4) (together, "Reid-Stith Deposition") at 13, 65.

Ms. Legree testified that, at the time defendants assert they ordered protestors to disperse, the crowd was already dispersing, and there was no one in the street.  Legree Deposition at 76.  Mr. Reid-Stith testified that, at the time he heard the police warning, "there was no one in the street." Reid-Stith Deposition at 13. Additionally, the plaintiff's

photographs appear to show that, after police had assembled in lines on either side of the protest, fewer protestors remained in the street than before.  See Pl.'s Ex.s C, E.

Captain Gilmore then ordered the arrest of individuals who remained in the street.[2]  See Pl.'s 56(a)2 Stmt. ¶ 62, Defs.' 56(a)1 Stmt. ¶ 62.  As Mr. Reid-Stith was walking from his vehicle toward the Waterbury Police Department, an officer gave a loud command and "all hell broke loose."  See Pl.'s 56(a)2 Stmt. ¶ 32, Defs.' 56(a)1 Stmt. ¶ 32. An unknown Officer John Doe grabbed Ms. Legree, knocked her down, pinned, and arrested her.  See Pl.'s 56(a)2 Stmt. ¶ 6, Defs.' 56(a)1 Stmt. ¶ 6.  The parties agree that the plaintiffs have not identified the John Doe officer who knocked Ms. Legree down, but that the officer was a black woman.  See Pl.'s 56(a)2 Stmt. ¶ 8,10, Defs.' 56(a)1 Stmt. ¶¶ 8,10.  Mr. Reid-Stith was also arrested by one or more John Doe Officers, who the parties agree also remain unidentified.  See Pl.'s 56(a)2 Stmt. ¶¶ 37-38, Defs.' 56(a)1 Stmt. ¶¶ 37-38.

The plaintiffs testified that they were not in the street at the time of their arrest. Ms. Legree testified that she was never in the street, that she was on the sidewalk, and had walked from the sidewalk to an adjacent parking lot to talk to a friend when she was arrested.  Legree Deposition at 30, 73-74.  Mr. Reid-Stith testified that he never stepped off the sidewalk, and instead was pulled off the sidewalk into the street by an arresting officer.  Reid-Stith Deposition at 25.

---

[2] In their 56(a)(2) statement, the plaintiffs deny the paragraph that alleges Captain Gilmore issued the order.  See Pl.'s 56(a)2 Stmt. ¶ 61-62.  However, they appear to deny the defendants' 56(a)(1) statement on other grounds, disputing the defendants' assertion that Captain Gilmore gave warning.  Id. Additionally, in their Memorandum, the plaintiffs state "it is undisputed that [Captain] Gilmore was involved in the arrest of both plaintiffs, as he gave the order to arrest . . . ". Pl.'s Opp. at 2. Accordingly, the statement that Captain Gilmore issued the arrest order is deemed admitted.  D. Conn. L. Civ. R. 56(a).

4

The parties also dispute exactly what role Officer Terni played in Ms. Legree's arrest. Officers Terni testified that he did not personally take into custody or arrest any of the protestors that day and was instead overseeing the actions of the members of the Field Force Unit. See Terni Affidavit at ¶ 12. The defendants' Affidavits state that Officer Terni's name appears on the arrest paperwork because, as the ranking and supervisory officer of the Field Force Unit, he was directed to complete the "Case/Incident Report" that day. See Terni Affidavit at ¶¶ 26-28, Gilmore Affidavit at ¶¶ 26-28. As a result, defendants admit that Officer Terni was considered the "arresting officer" of the plaintiffs, see Defs.' 56(a)1 Stmt. ¶ 80, even though Officer Terni testified that he did not physically take any of the demonstrators into custody. See Terni Affidavit at ¶ 27. However, the plaintiffs contend that Officer Terni not only prepared the Case/Incident Report; he was also arrested Ms. Legree. See Pl.'s 56(a)2 Stmt. ¶ 80; see also Exhibit A to Pl.'s 56(a)2 Stmt. ("Interrogatory Responses") (Doc. No. 44-1).

The remaining facts are undisputed. Seventeen people were taken into custody, placed under arrest, and taken into the Waterbury Police Department for processing and booking. See Pl.'s 56(a)2 Stmt. ¶ 65, Defs.' 56(a)1 Stmt. ¶ 65. When Ms. Legree was arrested, she told police her name was Torr Dawkins, who is a deceased male individual, but gave her date of birth. See Pl.'s 56(a)2 Stmt. ¶ 9, Defs.' 56(a)1 Stmt. ¶ 9. Before Ms. Legree was subjected to the booking process, she complained of difficulty breathing and was taken to St. Mary's Hospital where she disclosed her legal name. See Pl.'s 56(a)2 Stmt. ¶ 13, Defs.' 56(a)1 Stmt. ¶ 13. Ms. Legree was taken into custody and charged with disorderly conduct and interfering with an officer. See Pl.'s 56(a)2 Stmt. ¶ 14, Defs.' 56(a)1 Stmt. ¶ 14. The charges against Ms. Legree were

dismissed as the result of a mass dismissal of all individuals arrested that day in the City of Waterbury, resulting in no criminal conviction.  See Pl.'s 56(a)2 Stmt. ¶ 16, Defs.' 56(a)1 Stmt. ¶ 16. However, because Ms. Legree was on probation, she was subject to a violation of probation and a remand to custody order and was remanded to the Department of Correction for a violation of the conditions of her community release. See Pl.'s 56(a)2 Stmt. ¶ 17, Defs.' 56(a)1 Stmt. ¶ 17. As a result, she spent 162 days incarcerated, despite never being required to appear in Court for the charges related to her May 31, 2020 arrest.  See Pl.'s 56(a)2 Stmt. ¶ 18, Defs.' 56(a)1 Stmt. ¶ 18.  Mr. Reid-Stith was arrested and charged with disorderly conduct and interfering with an officer, but his charges were similarly dismissed as a result of the mass dismissal of charges.  See Pl.'s 56(a)2 Stmt. ¶ 41, Defs.' 56(a)1 Stmt. ¶ 41.

In July 2020, around the time his criminal case was dismissed, Mr. Reid-Stith met with an attorney about bringing a claim against the Waterbury Police Department for false arrest.  See Pl.'s 56(a)2 Stmt. ¶ 42, Defs.' 56(a)1 Stmt. ¶ 42. Mr. Reid-Stith was told by the attorney that he did not handle civil cases, but he advised Mr. Reid-Stith that he had three years to file the claim.  See id.

On April 13, 2022, Mr. Reid-Stith filed a Voluntary Bankruptcy Petition.  See Pl.'s 56(a)2 Stmt. ¶ 44, Defs.' 56(a)1 Stmt. ¶ 44.  Initially, he did so pro se, but later filed an amended petition with the help of an attorney.  See Pl.'s 56(a)2 Stmt. ¶ 44, Defs.' 56(a)1 Stmt. ¶ 44, see also Def's Ex. 9 ("Bankruptcy Petition") (Doc. No. 39-11). In his bankruptcy paperwork, Mr. Reid-Stith was asked whether he had any claims against third parties, and he twice answered "no."  See Pl.'s 56(a)2 Stmt. ¶ 46, Defs.' 56(a)1 Stmt. ¶ 46. At the time, Mr. Reid-Stith did not know what the question meant, nor did he

ask his attorney what the question meant.  Pl.'s 56(a)2 Stmt. ¶¶ 45, 47 Defs.' 56(a)1
Stmt. ¶¶ 45, 47.  Mr. Reid-Stith's bankruptcy attorney also did not ask him whether he
had any outstanding potential claims.  Pl.'s 56(a)2 Stmt. ¶¶ 48-49, Defs.' 56(a)1 Stmt.
¶¶ 48-49.  The bankruptcy matter concluded in September 2022; Mr. Reid-Stith
received a discharge of debts.  Pl.'s 56(a)2 Stmt. ¶ 52, Defs.' 56(a)1 Stmt. ¶ 52.

     B.    <u>Procedural Background</u>

On May 13, 2022, Ms. Legree filed her Complaint against the City of Waterbury
and Officers John Doe, Steve Gilmore, and David Terni.  <u>See</u> Complaint (Doc. No. 1).
On November 3, 2022, Ms. Legree amended her Complaint with the court's leave, to
add Mr. Reid-Stith as a plaintiff.  <u>See</u> Amended Complaint ("Am. Compl.") (Doc. No. 21).
Count One of the Amended Complaint alleges unconstitutional excessive force against
Ms. Legree by Officer John Doe, and Count Two alleges a state law claim against
Officer John Doe for assault and battery.  Am. Compl. at 6-7.  Count Three alleges the
false arrest of Ms. Legree and Mr. Reid-Stith by Officers Doe, Terni, and Gilmore.  <u>See</u>
<u>id</u> at 7.  Count Four alleges Malicious Prosecution against Officers Doe and Terni.  <u>See</u>
<u>id.</u>  Count Five is a <u>Monell</u> claim against the City of Waterbury, alleging that the City had
a policy or custom of failing to respect the First Amendment Rights of protestors.  <u>See</u>
<u>id.</u>  Count Six is a state municipal liability claim.  <u>See id</u> at 8.  Count Seven is a First
Amendment claim against Doe, Terni, and Gilmore.  <u>See</u> <u>id.</u>  Count Eight is an alleged
due process violation.  Count Nine is a claim for failure to intervene in the alleged illegal
conduct against the plaintiffs.  <u>See</u> <u>id</u> at 9.  All the counts are brough under section
1983, except Counts Two and Six, which are state law claims.

On December 21, 2022, the defendants moved to dismiss Mr. Reid-Stith's claims on the grounds that they are barred by the doctrine of judicial estoppel, because he failed to disclose them in his Bankruptcy Petition. <u>See</u> Motion to Dismiss ("Mot. to Dismiss") (Doc. No. 22). The plaintiffs opposed the Motion. <u>See</u> Memorandum in Opposition (Doc. No. 23). On June 26, 2023, the court denied the Motion without prejudice to defendants raising the same argument at the summary judgment stage. <u>See</u> Order ("MTD Ruling") (Doc. No. 28). In its Ruling, the court reasoned that, although Mr. Reid-Stith took an inconsistent factual position that was adopted by the Bankruptcy Court, the balance of equities did not tilt in favor of judicial estoppel. <u>See generally</u>, <u>id</u>.

On September 5 , 2023, the defendants filed the present Motion for Summary Judgment. <u>See</u> Defendants' Motion for Summary Judgment ("Defs.' Mot.") (Doc. No. 39). The plaintiffs oppose the Motion. <u>See</u> Plaintiff's Memorandum in Opposition ("Pl.'s Opp.") (Doc. No. 45). In their opposition, the plaintiffs withdraw all claims against "John Doe" officers and argued that summary judgment should be denied with respect to their false arrest claims against Officers Gilmore and Terni (Count Three), their <u>Monell</u> claim against the City of Waterbury (Count Five), their state law municipal liability claim against the City of Waterbury (Count Six), and their First Amendment claim against Officers Gilmore and Terni (Count Seven). <u>See</u> Pl.'s Opp at 1-2.

## III.    LEGAL STANDARD

A motion for summary judgment may be granted only when the moving party can establish that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); <u>Anderson v. Liberty</u>

Lobby, Inc., 477 U.S. 242, 256 (1986); Wright v. N.Y. State Dep't of Corr., 831 F.3d 64,

71-72 (2d Cir. 2016).  If the moving party satisfies this burden, the nonmoving party

must set forth specific facts demonstrating that there is indeed "a genuine issue for

trial."  Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009).  A genuine issue exists where

"the evidence is such that a reasonable jury could return a verdict for the nonmoving

party."  Cross Com. Media, Inc. v. Collective, Inc., 841 F.3d 155, 162 (2d Cir. 2016).

Unsupported allegations do not create a material issue of fact and cannot

overcome a properly supported motion for summary judgment.  See Weinstock v.

Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000).  In assessing the record to determine

whether there are disputed issues of material fact, the trial court must "resolve all

ambiguities and draw all inferences in favor of the party against whom summary

judgment is sought."  LaFond v. Gen. Physics Servs. Corp., 50 F.3d 165, 175 (2d Cir.

1995).

## IV.    DISCUSSION

The defendants have moved for summary judgment on each of the plaintiffs'

claims.[3]  See Defendants' Memorandum of Law in Support of Motion for Summary

Judgment ("Defs.' Mem.") (Doc. No. 39-2).

A.    Withdrawn Claims

In their opposition, the plaintiffs withdraw their First, Second, Fourth, Eighth, and

Ninth Claims, and all claims against Officer John Doe.  See Pl.'s Opp. at 1-2.

"Preparation of a response to a motion for summary judgment is a particularly

---

[3] Though the plaintiffs, in opposition, claim that defendants' Motion failed to address their First Amendment claim, see Pl.'s Opp at 8-9, defendants note in their Memorandum of Law that their qualified immunity defense applies to all of the plaintiffs' section 1983 claims, which include the plaintiffs' First Amendment claim.  See Am. Compl. at 7.

appropriate time for a non-movant party to decide whether to pursue or abandon some claims or defenses." Jackson v. Fed. Exp., 766 F.3d 189, 196 (2d Cir. 2014). The court grants summary judgment for the defendants with respect to the plaintiffs' First, Second, Fourth, Eighth, and Ninth Claims, as well as all claims against Officer John Doe.

The plaintiffs' remaining claims are Count Three (false arrest under section 1983 against Officers Gilmore and Terni), Count Five and Count Six (plaintiffs' Monell and municipal liability claims, respectively, against the City of Waterbury), and Count Seven (First Amendment claims under section 1983 against Officers Gilmore and Terni).

B.   Judicial Estoppel

The defendants reprise their argument that Mr. Reid-Stith's claims are barred by the doctrine of judicial estoppel because he failed to disclose them in his Bankruptcy Petition. Def.'s Mem. at 10-17. The plaintiffs respond that the defendants have not produced new information sufficient to reverse the court's prior decision. Pl.'s Opp at 2-3.

Judicial estoppel is a rule "designed to prevent a party who plays fast and loose with the courts from gaining unfair advantage through the deliberate adoption of inconsistent positions in successive suits." Wight v. BankAmerica Corp., 219 F.3d 79, 89 (2d Cir. 2000). It is an equitable doctrine invoked at the discretion of the court. See New Hampshire v. Maine, 532 U.S. 742, 750 (2001). In the bankruptcy context, courts often apply judicial estoppel "to prevent a party who failed to disclose a claim in bankruptcy proceedings from asserting that claim after emerging from bankruptcy." Negron v. Weiss, No. 06-CV-1288, 2006 WL 2792769, at *3 (E.D.N.Y. Sept. 27, 2006).

The party asserting judicial estoppel must show "two prerequisite elements": "(1) that the party against whom the estoppel is asserted took an inconsistent position in a prior proceeding and (2) that that position was adopted by the first tribunal in some manner, such as by rendering a favorable judgment." Clark v. All Acquisition, LLC, 886 F.3d 261, 266 (2d Cir. 2018) (internal quotation marks omitted). However, judicial estoppel is not a "mechanical rule": even if the two prerequisites are met, courts "must inquire into whether the particular factual circumstances of a case 'tip the balance of equities in favor' of [estoppel]." Id. at 266-67 (quoting Maine, 532 U.S. at 751). In particular, courts in the Second Circuit often "require[ ] a showing that the party asserting the two inconsistent positions would derive an unfair advantage against the party seeking estoppel." Ashmore v. CGI Grp., Inc., 923 F.3d 260, 272 (2d Cir. 2019). In the bankruptcy context, courts may also justify judicial estoppel in part because of any "unfair advantage" the estopped party may have gained over "former creditors, who had a right to consider the [undisclosed] claims during the bankruptcy proceeding." BPP Ill., LLC v. Royal Bank of Scot. Grp. PLC, 859 F.3d 188, 194 (2d Cir. 2017). Finally, because judicial estoppel is meant to protect the judicial process, courts will only impose it in "situations where the risk of inconsistent results with its impact on judicial integrity is certain." Simon v. Safelite Glass Corp., 128 F.3d 68, 72 (2d Cir. 1997).

In its prior Ruling on the defendants' Motion to Dismiss, the court found that the two prerequisite elements of judicial estoppel had been met: that (1) Mr. Reid-Stith took an inconsistent position in his prior bankruptcy proceeding, and (2) that his prior answers were adopted by the Bankruptcy Court. See MTD Ruling at 7-8. Now at the summary judgment stage, the record once again supports that finding. The parties

agree that Mr. Reid-Stith represented to the Bankruptcy Court that he had viable no claims against third parties, which is inconsistent with his position in the present action. See Pl.'s 56(a)2 Stmt. ¶ 46, Defs.' 56(a)1 Stmt. ¶ 46. The Bankruptcy Court adopted that position when it discharged his debts. See Adelphia Recovery Tr. v. Goldman, Sachs & Co., 748 F.3d 110, 118 (2d Cir. 2014) ("adoption [of an inconsistent position] in judicial estoppel is usually fulfilled when the Bankruptcy Court confirms a plan pursuant to which creditors release their claims against the debtor.").

On the present record, the court must again determine whether the "balance of equities [tip] in favor' of [estoppel]." Clark, 886 F.3d at 266-267. In its prior Ruling, the court concluded that circumstances weighed against the application of estoppel for two reasons. First, it did not appear that Mr. Reid-Stith gained an "unfair advantage" over his creditors, because it was unclear from the record that disclosing the claims would have altered the outcome of his bankruptcy proceeding. MTD Ruling at 9-10. Second, the court found that there was an insufficient basis to conclude that Mr. Reid-Stith was playing "fast and loose" with the bankruptcy process, or that he intended to deceive the Bankruptcy Court for his benefit. MTD Ruling at 10-11; see also Ashmore, 923 F.3d at 281; see also DeBella v. Duarte, No. 3:17-cv-01560, 2019 WL 1438178, at *2 (D. Conn. Apr. 1, 2019) (refusing to impose judicial estoppel in part because "the facts do not circumstantially suggest a significant likelihood that the omission was the product of any intent to deceive"). The court reached this conclusion, in part, based on the observation that "[i]t is possible that [Mr.] Reid-Stith simply did not fully understand his potential claim at the time of the bankruptcy proceeding." MTD Ruling at 11.

The new fact before the court at summary judgment is that Mr. Reid-Stith consulted with an attorney about bringing a claim against the Waterbury Police Department in July 2020, prior to filing his Bankruptcy Petition in April 2022.  See Pl.'s 56(a)2 Stmt. ¶ 42, Defs.' 56(a)1 Stmt. ¶ 42.  Mr. Reid-Stith testified that, when he consulted with an attorney, he was advised on the three-years statute of limitations.  See Reid Stith Deposition at 44.  Therefore, Mr. Reid-Stith knew something about a potential claim at the time he filed his Bankruptcy Petition in April 2022.

Mr. Reid-Stith's knowledge of his claim makes this determination a closer issue for the court.  However, Mr. Reid-Stith also testified that he did not understand the question about claims on his Bankruptcy Petition and, if he had understood the question to apply to claims such as this one not yet asserted at the time, he would have disclosed it.  See id at 67-68.  He testified that he never asked his bankruptcy attorney what the question about claims meant, nor did his bankruptcy attorney ever ask him whether he had outstanding potential claims.  Id.  Based on this testimony, a reasonable jury could find that Mr. Reid-Stith's omissions were honest mistakes, not the product of any "intent to deceive".  DeBella v. Duarte, No. 3:17-cv-01560, 2019 WL 1438178, at *2 (D. Conn. Apr. 1, 2019).  Because a genuine issue of fact remains about Mr. Reid-Stith's intent and the credibility of his testimony, the court cannot conclude at this stage that this factor supports judicial estoppel.

The court also remains unpersuaded that Mr. Reid-Stith gained an unfair advantage through his answers.  There is no new information in the record at the summary judgment stage to suggest that Mr. Reid-Stith's nondisclosure had more than a "de minimis effect" on the bankruptcy proceeding.  See Clark, 886 F.3d at 267.  To

hold otherwise, the court would have to infer that the bankruptcy trustee would have pursued a section 1983 claim against Waterbury police on behalf of Mr. Reid-Stith's bankruptcy estate.  There is no evidence in the record to support that inference, and the court is required to "resolve all ambiguities and draw all inferences" in the non-moving party's favor.  LaFond v. Gen. Physics Servs. Corp., 50 F.3d 165, 171 (2d Cir. 1995).  Therefore, the argument that Mr. Reid-Stith gained an "unfair advantage" over his creditors remains too "theoretical and speculative" for the court to accept at this stage.  See Ashmore, 923 F.3d at 278.

Because triable issues of fact remain over Mr. Reid-Stith's intent and whether he gained an unfair advantage over his creditors, the court cannot conclude at this stage that the "balance of equities" tips in favor of judicial estoppel.  Accordingly, summary judgment on the grounds of judicial estoppel with respect to Mr. Reid-Stith's claims is denied.

C.    False Arrest

Count Three of the plaintiffs' Amended Complaint is a claim of false arrest brought under Section 1983.  Am. Compl. at 7.  The defendants assert three arguments why the plaintiffs' false arrest claims should be dismissed. First, defendants argue Officers Gilmore and Terni were not the plaintiffs' arresting officers, and they therefore lack the personal involvement necessary for individual liability under section 1983.  See Def.'s Mem. at 8-10.  Second, defendants argue they had probable cause to arrest the plaintiffs, which is an absolute defense against a false arrest claim.  See id at 17-22.  Third, the defendants argue that, even if they lacked probable cause, they are entitled to qualified immunity because they had "arguable probable cause" to arrest the plaintiffs.

See id at 32-38.  The plaintiffs respond that (1) Officers Gilmore and Terni were personally involved in the arrests, (2) that there is a genuine fact issue whether the officers had probable cause to arrest the plaintiffs, and (3) that the defendants are not entitled to qualified immunity.  See Pl.'s Opp., 2, 5-7, 9-14.

Claims for false arrest brought under section 1983, to vindicate the Fourth and Fourteenth Amendment right to be free from unreasonable seizures, are "substantially the same" as claims for false arrest under state law.  Jocks v. Tavernier, 316 F.3d 128, 134 (2d Cir. 2003) (internal quotation marks and citations omitted).  A false arrest is "the unlawful restraint by one person of the physical liberty of another."  Edelman v. Page, No. 3:00-CV-01166 JAM, 2015 WL 1395893, at *11 (D. Conn. Mar. 25, 2015), aff'd sub nom. Edelman v. Schultz, 683 F. App'x 60 (2d Cir. 2017).  To prevail on a claim of false arrest, a plaintiff must show that "(1) the defendant intentionally arrested [them] or had [them] arrested; (2) the plaintiff was aware of the arrest; (3) there was no consent to the arrest; and (4) the arrest was not supported by probable cause."  Conroy v. Caron, 275 F. Supp. 3d 328, 348 (D. Conn. 2017).  In the present case, the defendants do not contest that the plaintiffs were aware of the arrest and that there was no consent to the arrest, elements (2) and (3), supra. Therefore, the plaintiff's false arrest claims on summary judgment turn on whether a particular defendant (1) "intentionally arrested [the plaintiffs] or had [them] arrested," and (4) whether the arrest was supported by probable cause. See id

The existence of probable cause is a complete defense to a false arrest claim under section 1983.  See Betts v. Shearman, 751 F.3d 78, 82 (2d Cir. 2014). Additionally, an officer is entitled to qualified immunity from a claim for false arrest if

they had at least <u>arguable</u> probable cause to have made the arrest.  <u>Stansbury v. Wertman</u>, 721 F.3d 84, 88 (2d Cir. 2013).

      1.    <u>Personal Involvement</u>

The defendants argue that, because Officers Gilmore and Terni were not the arresting officers of the plaintiffs, they lack the personal involvement in the plaintiffs' arrests necessary to be liable.  Def.'s Mem. at 8-10.  The plaintiffs counter that Captain Gilmore was personally involved because he issued the arrest order, and Officer Terni was personally involved because he was an arresting officer of Ms. Legree.  Pl.'s Opp. at 2.

It is well settled that the "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [section] 1983."  <u>Wright v. Smith</u>, 21 F.3d 496, 501 (2d Cir. 1994), quoting <u>Moffitt v. Town of Brookfield</u>, 950 F.2d 880, 886 (2d Cir. 1991).  Further, "there is no special rule of supervisory liability" in section 1983 actions.  <u>Tangreti v. Bachmann</u>, 983 F.3d 609, 618 (2d Cir. 2020).[4]  Instead, a plaintiff must plead and prove 'that each Government-official defendant, through the officials' own individual actions, has violated the Constitution.'"  <u>Id.</u> (quoting <u>Ashcroft v. Iqbal</u>, 556 U.S. 662 (2009)).  The factors necessary to establish a [section 1983] violation will vary with the constitutional provision at issue' because the elements of different constitutional violations vary."  <u>Id.</u> (quoting <u>Iqbal</u>, 556 U.S. 662 at 676 (alteration in the original).  For a false arrest, the supervisor's conduct would also

---

[4] Prior to <u>Tangreti</u>, 983 F.3d 609, courts in this Circuit used the broader five-factor test for supervisory liability found in <u>Colon v. Coughlin</u>, 58 F.3d 865, 873 (2d Cir. 1995).  However, following the Supreme Court's decision in <u>Iqbal</u>, the Second Circuit repudiated this test and held that "there is no special rule of supervisory liability" in section 1983 actions."  <u>Tangreti v. Bachmann</u>, 983 F.3d 609, 618 (2d Cir. 2020).

have to satisfy the elements that they "arrested [the plaintiffs] or had [the plaintiffs] arrested . . . ." Conroy v. Caron, 275 F. Supp. 3d 328, 348 (D. Conn. 2017).

However, "personal involvement" in an arrest is not limited to officers who were physically involved in taking someone into custody.  Courts in this Circuit have upheld false arrest liability for non-arresting officers.  See Taylor v. City of New York, No. 19 CIV. 6754 (KPF), 2022 WL 744037 (S.D.N.Y. Mar. 11, 2022) (finding triable issues of fact about a supervisor's personal involvement, when he had arrived after an arrest but handled evidence and paperwork), see also Pizarro v. Kasperzyk, 596 F. Supp. 2d 314 (D. Conn. 2009) (holding an officer liable for providing a false identification expected to cause an arrest).  Most significant to the present case, several District Courts have held that completing arrest paperwork can be sufficient to demonstrate personal involvement in an arrest, even for officers who were not present at the scene.  See Arbuckle v. City of New York, No. 14 CIV. 10248 (ER), 2016 WL 5793741, at *13 (S.D.N.Y. Sept. 30, 2016) ("conduct such as ordering that an arrest be made or filling out arrest paperwork can suffice to demonstrate direct participation."); Shaheed v. City of New York, 287 F. Supp. 3d 438, fn. 6 (S.D.N.Y. 2018), aff'd sub nom. Shaheed v. Kroski, 833 F. App'x 868 (2d Cir. 2020) (finding a defendant-officer was personally involved even though she did not "physically effect either plaintiff's arrest," because she completed arrest paperwork based on her observations of the scene), Marom v. City of New York, No. 15-CV-2017 (PKC), 2016 WL 916424, at *16 (S.D.N.Y. Mar. 7, 2016) (finding two non-supervisory officers "directly participated" in the arrest by completing arrest paperwork with allegedly false statements).  Personal involvement in an arrest, therefore, does not require physical involvement.

For Captain Gilmore, the parties agree that he was present at the scene and gave the order that led to the plaintiffs' arrests. See Pl.'s 56(a)2 Stmt. ¶¶ 61-63; Defs.' 56(a)1 Stmt. ¶¶ 61-63.  That is sufficient to base a finding that he caused the plaintiffs to be arrested.  See Conroy, 275 F. Supp. 3d at 348. (listing as an element whether the officer "intentionally arrested [the plaintiffs] or had [them] arrested (emphasis added)"), See also Provost v. City of Newburgh, 262 F.3d 146, 155 (2d Cir. 2001) ("ordering or helping others to do the unlawful acts, rather than doing them [oneself]," can constitute "direct participation."). A reasonable jury could therefore find that Captain Gilmore was personally involved in the arrest.[5]

For Officer Terni, the following facts are undisputed.  First, Officer Terni was the "Officer in Charge" of the Field Force Unit, one of the police units that conducted arrests at the scene of the plaintiffs' arrests.  See Terni Affidavit at ¶¶ 2,7, Pl.'s 56(a)2 Stmt. ¶¶ 53, 59-60.  Second, Officer Terni was present at the scene of the arrests and oversaw the actions of members of the Field Force Unit.  See Terni Affidavit at ¶ 12. Pl.'s 56(a)2 Stmt. ¶ 53.  Third, Officer Terni, as a supervisor of the Field Force Unit, completed the paperwork for the plaintiffs' arrests.  See Terni Affidavit at ¶ 21, Pl.'s 56(a)2 Stmt. ¶ 73. Fourth, on the arrest paperwork, Terni listed himself as the "Investigating Officer" and signed them in the field marked "Investigator Signature."  See Def.'s Ex. 5 ("Case Incident Report") (Doc. No. 39-7).  Finally, the defendants identified Officer Terni as the

---

[5] In this section of their Memorandum, the defendants argue that the plaintiffs have failed to prove their complaint allegation against Captain Gilmore, which alleged his order was "pretextual and calculated as a signal to officers to begin arresting protestors . . . without probable cause."  See Def.'s Mem. at 9, Am. Compl. at ¶ 26.  However, that argument is irrelevant to the elements of a false arrest claim, which only require plaintiffs to show that a defendant officer "intentionally . . . had [the plaintiffs] arrested," and that the arrest was "not supported by probable cause."  See Conroy, 275 F. Supp. 3d at 348.  Put another way, a false arrest claim has "no state-of-mind requirement, only an objectively reasonable standard."  See Marom v. City of New York, No. 15-CV-2017 (PKC), 2016 WL 916424, at *15 (S.D.N.Y. Mar. 7, 2016).

"arresting officer of Rudonna Legree" in their interrogatory responses.[6]  See Interrogatory Responses.

The plaintiffs claim, based largely on defendants' responses to interrogatories, that Ms. Legree was arrested by Officer Terni.  See Pl.'s 56(a)2 Stmt. ¶ 6.  The defendants dispute this, conceding that he was only considered the "arresting officer" because of his role in preparing arrest paperwork, and that he did not personally take any of the protestors into custody that day.  See Terni Affidavit at ¶ 12.  Because Officer Terni is a white male, the defendants also argue that Ms. Legree's testimony that she was tackled to the ground by a black, female officer, renders it impossible that Officer Terni could be her arresting officer.  Legree Deposition at 49.

In the court's view, there is no dispute over whether Officer Terni was the John Doe Officer who knocked Ms. Legree down and took her into custody.  However, Officer Terni can be personally involved in the arrest even if he did not carry out the physical takedown.  see Arbuckle v. City of New York, No. 14 CIV. 10248 (ER), 2016 WL 5793741, at *13 (S.D.N.Y. Sept. 30, 2016) ("conduct such as ordering that an arrest be made or filling out arrest paperwork can suffice to demonstrate direct participation.")

In the court's view, there is a material issue of fact over Officer Terni's personal involvement.  Officer Terni cannot be liable under section 1983 solely based off his status as a supervisor of arresting officers, nor does his presence at the scene automatically suffice to demonstrate his personal involvement, See Travis v. Vill. of Dobbs Ferry, 355 F. Supp. 2d 740 (S.D.N.Y. 2005).  However, drawing all inferences in

---

[6] It is unclear to the court why the defendants did not amend their interrogatory responses when it became clear to them, as they now claim, that "it is undisputed that Terni did not arrest [Ms.] Legree." Def.'s Mem. at 9.  Regardless, an answer to an interrogatory may be used as evidence to the extent allowed by the Federal Rules of Evidence.  See Fed. R. Civ. P. 33(c).

the plaintiffs' favor, his presence at the scene, coupled with the fact he was actively overseeing a unit making arrests, supports the inference that he played an active role in the arrests.  In addition, he was tasked with filling out arrest paperwork, requiring him to supply a factual justification for the plaintiffs' arrests from his own personal knowledge. see Marom v. City of New York, No. 15-CV-2017 (PKC), 2016 WL 916424 (S.D.N.Y. Mar. 7, 2016) (upholding false arrest liability for two NYPD officers who were not present at the plaintiffs' but falsely filled out arrest paperwork).  It is also noteworthy that Officer Terni's role was such that WPD considered him the plaintiffs' "arresting officer." See Gilmore Affidavit at ¶ 28, Terni Affidavit at ¶ 28.  These circumstances create a genuine issue of fact over whether he was personally involved in the plaintiffs' arrests. In the court's view, a reasonable jury could find that Officer Terni was personally involved in the plaintiffs' arrests; therefore, summary judgment on this ground is inappropriate. See Williams v. Smith, 781 F.2d 319, 323 (2d Cir. 1986) (stating personal involvement is a question of fact).

Because Captain Gilmore gave the order that resulted in Ms. Legree's arrest as well as Mr. Reid-Stith's arrest, and because there is a triable issue of fact regarding Officer Terni's involvement, the court declines to grant the defendants summary judgment on the grounds of lack of personal involvement.

### 2.   Probable Cause

The defendants argue that the arrests of the plaintiffs were supported by probable cause, which is a complete defense against false arrest claims under section 1983. Betts v. Shearman, 751 F.3d 78, 82 (2d Cir. 2014). Specifically, the defendants argue that the plaintiffs were in the street and refusing to comply with dispersal orders

requesting that they leave the street.  Def.'s Mem. at 19-22. The plaintiffs respond that there is a genuine issue of material fact of whether defendants had probable cause to arrest them.  In response, the plaintiffs contest that they were in the street at the time of the arrests, and that officers did not issue sufficient warnings, so the officers had no basis to arrest them. Pl.'s Opp. at 5-7.

Probable cause exists if police "officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient in themselves to warrant a person of reasonable caution in the belief that (1) an offense has been or is being committed (2) by the person to be arrested." United States v. Cole, 26 F. App'x 45, 46–47 (2d Cir. 2001).  The only basis that the defendants provide for arresting the plaintiffs on May 31, 2020, is that protestors were in the street blocking traffic. Def.'s Mem. at 17-21.

Indeed, someone violates the Connecticut disorderly conduct statute when, "with intent to cause inconvenience, annoyance, or alarm, or recklessly creating a risk thereof. . . "(5) obstructs vehicular or pedestrian traffic." Conn. Gen. Stat. § 53a-182. The Connecticut Supreme Court has construed the misdemeanor's "intent" element to mean "predominant intent." State v. Indrisano, 228 Conn. 795, 810 (1994). Thus, "to support a conviction for disorderly conduct [under section 53a–182(a)], the defendant's predominant intent must be to cause inconvenience, annoyance or alarm, rather than to exercise his constitutional rights. Id.

The plaintiffs' testimonial evidence sharply disputes that Ms. Legere and Mr. Reid-Stith were obstructing traffic. Ms. Legree testified that she was on the sidewalk

when arrested and never entered the street.[7]  <u>See</u> Exhibit 1 to Def.'s Mem. ("Legree

Deposition") (Doc. No. 39-3).  Mr. Reid-Stith testified that he was planning to cross the

street to get away from a group of people who were talking to police officers but, before

he stepped into the street, he was pulled off the sidewalk and arrested. <u>See</u> Exhibit 2 to

Dev.'s Mem. ("Reid-Sith Deposition") (Doc. No. 39-4).  Based on this evidence, a

reasonable jury could find that the plaintiffs were not blocking traffic at the time of their

arrest.

Additionally, the parties dispute whether the defendants gave audible warnings

before beginning to arrest protestors.  This dispute also relies on the plaintiffs'

testimony. There are no audio or video recordings in the pretrial record.  Accordingly,

the court finds there is a genuine issue about whether police issued sufficient warnings

prior to commencing the arrests.  Because there are genuine issues of fact with respect

to whether the plaintiffs were obstructing traffic and whether police gave adequate

warnings, both factual bases supplied by the defendants for probable cause are in

genuine dispute.

Finally, the court briefly notes that the parties have an additional factual dispute

about the extent to which protestors other than the plaintiffs were blocking traffic.

Indeed, the record is filled with disputes about when and to what extent protestors were

in the street. However, even if protestors were blocking traffic, it would not, as a matter

---

[7] In their Memorandum, the defendants point to the Amended Complaint allegation that, in response to officers' demands, Ms. Legree "began backing up off the street."  Am. Compl. at ¶ 14. Therefore, the defendants argue, she must have been in the street at some point.  Def.'s Mem. at 19-20. While it is clear that a defendant may not create an issue of fact by submitting a summary judgment affidavit that contradicts the affiant's previous deposition testimony, <u>see</u> <u>Hayes v. New York City Dep't of Corr.</u>, 84 F.3d 614, 619 (2d Cir. 1996), that is not the case here.  In her pre-summary judgment testimony, Ms. Legree is consistent in her position that she was never in the street.  Legree Deposition at 73-74. The court here declines to bind Ms. Legree to what may have been an inartful pleading when her sworn testimony is clear.

of law, supply the officers with probable cause to arrest demonstrators who remained on the sidewalk.  See Jones v. Parmley, 465 F.3d 46, 58 (2d Cir. 2006) (holding that police lacked probable cause to arrest protestors generally after a few demonstrators entered a roadway to hand out fliers).  The relevant inquiry is whether the defendants had probable cause to arrest the plaintiffs. If a reasonable jury found, as it could on this record, that the plaintiffs were not blocking traffic, then defendants lacked probable cause. Summary judgment is therefore denied on these grounds.

        3.    Qualified Immunity

The defendants argue that, even if their arrests lacked probable cause, they were supported by "arguable probable cause", and not violate any "clearly established law", entitling them to the defense of qualified immunity.  Def.'s Mem. at 32-38.  The plaintiffs counter that the defendants are not entitled to qualified immunity because their arrests lacked "arguable probable cause" and did violate clearly established law. Pl.'s Opp. at 9-14.

In the context of false arrest claims, officers can show they are entitled to qualified immunity by showing that their arrests had at least "arguable probable cause (emphasis added)." Zalaski v. City of Hartford, 723 F.3d 382, 390 (2d Cir. 2013). Arguable probable cause exists if "either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met. Id. citing. Escalera v. Lunn, 361 F.3d 737, 743 (2d Cir. 2004).

The defendants' argument for arguable probable cause rests on the same disputed facts as their argument for probable cause, namely, whether the plaintiffs were

in the street and whether dispersal orders were adequately communicated.  See Case v. City of New York, 408 F. Supp. 3d 313, 322 (S.D.N.Y. 2019) (holding that a finding of arguable probable cause is inappropriate when a genuine dispute existed over whether a plaintiff-protestor was blocking traffic). "Because the facts underlying arguable probable cause are contested, and because such factual disputes prevent evaluation of the reasonableness of the officer[s'] actions," see id, summary judgment on qualified immunity grounds based on arguable probable cause is not appropriate.

In addition, the defendants contend that, by arresting the plaintiffs, they violated no "clearly established law." Def.'s Mem. at 36-37.  After reviewing the law of this Circuit, the court finds the defendants' argument unpersuasive.

There are two questions that courts must consider when conducting the qualified immunity analysis generally: (1) whether the "officer[s'] conduct violated plaintiff's constitutional rights" and, if so, (2) whether the right was "clearly established at the time of defendant's actions[.]"  Zalaski, 723 F.3d at 388.  The Supreme Court has emphasized that, in determining whether a right was clearly established, the court may not define the right with a high level of generality; rather, "the clearly established right must be defined with specificity."  City of Escondido v. Emmons, 586 U.S. 38, 42 (2019). In determining whether a right was clearly established, courts "consider the specificity with which a right is defined, the existence of Supreme Court or [Second Circuit] Court of Appeals case law on the subject, and the understanding of a reasonable officer in light of preexisting law."  Terebesi v. Torresco, 764 F.3d 217, 231 (2d Cir. 2014).  "For law to be clearly established, it is not necessary to identify a case directly on point.  But

precedent must have spoken with sufficient clarity to have placed the constitutional question at issue beyond debate."  Mara v. Rilling, 921 F.3d 48, 68 (2d Cir. 2019).

In Jones v. Parmley, the Second Circuit held that police officers' decision to disperse a demonstration, due to a small minority of the protestors who briefly entered the adjacent highway, violated the protestors' "clearly established constitutional right to protest," denying qualified immunity for First Amendment and state false arrest claims.[8] Jones v. Parmley, 465 F.3d 46, 58 (2d Cir. 2006) (Sotomayor, J.).  The Court held that, under those circumstances, there was no objectively reasonable basis for "indiscriminate mass arrests," especially because "[n]one of the troopers could identify any person at the gathering as having been on the road."  Id. at 60.  In this case, this is sufficient, the court concludes, to show that the decision of a few protestors to enter the street does not deprive those who remained on the sidewalk of their clearly established right to demonstrate.[9]  Put another way, no reasonable officer could find that the arrest of a peaceful protestor who remained on the sidewalk was lawful, just because other protestors were in the street.

Because a genuine issue of material fact exists about whether the plaintiffs were in the street and blocking traffic at the time of the arrest order, the court cannot bar

---

[8] Additionally, in Jones v. Parmley, the court held that the absence of a dispersal order violated clearly established law.  Here, there is a genuine dispute about the extent to which the defendants gave a warning.  Although the court is aware that the protest in Jones took place on private property, a case does not need to be "directly on point" to speak with sufficient clarity "to have placed the constitutional question at issue beyond debate."  Mara v. Rilling, 921 F.3d 48, 68 (2d Cir. 2019).

[9] Defendants argue that Garcia v. Does, 779 F.3d 84 (2d Cir. 2015), entitles them to qualified immunity. However, in the court's view, Garcia is factually distinguishable.  In Garcia, numerous protestors – at a gathering of thousands – began to defy police warnings and attempted to occupy the Brooklyn Bridge.  At the Motion to Dismiss stage, the complaint allegations, as well as numerous videos of the event incorporated by reference, placed it generally beyond dispute that a large number of protestors had entered the bridge.  By contrast, in the present case there is no video evidence, and there is a genuine fact dispute as to whether the plaintiffs are among the protestors pictured in the street.  See Pl.'s Exhibits C & E.

plaintiffs' claims on the ground of qualified immunity.  Because a reasonable jury could find that the defendant officers were personally involved in the arrests, that the arrests lacked probable cause, and that the defendants are not entitled to qualified immunity at this stage, summary judgment with respect to the plaintiffs' false arrest claims in Count Three is denied.

### D.      First Amendment Claim

The defendants also argue that they are entitled to qualified immunity for the plaintiff's First Amendment section 1983 claims.  Def's Mem. at 32.  There is no need for the court to reprise here its prior analysis concerning qualified immunity for the plaintiff's arrests. See supra at 23-26.  On the plaintiffs' version of the facts, a reasonable jury could find that the arrests violated the plaintiffs' "clearly established constitutional right to protest" under the First Amendment. See Jones v. Parmley, 465 F.3d 46 at 60. Therefore the defendants' Motion with respect to Count Seven is denied.

### E.      Monell Claim

The Amended Complaint alleges a Monell claim of municipal liability under section 1983.  See Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658 (1978).  In their Motion for Summary Judgment, defendants argue that the plaintiffs have failed to identify a policy of the City of Waterbury that caused the constitutional violations that they allege, and therefore their Monell claim should be dismissed.  Def.'s Mem. at 30-32.  The plaintiffs respond that the City of Waterbury should be liable because it acquiesced or ratified the police officers' unconstitutional conduct. Pl.'s Opp. at 7-8.

In order to hold a municipality liable under section 1983, a plaintiff must establish that the municipality had a policy, custom, or practice that was intended to violate or that was deliberately indifferent to constitutional rights, and that this policy, custom, or practice actually caused the violation by municipal actors of plaintiff's constitutional rights.  See, e.g., Connick v. Thompson, 563 US. 51, 60–61 (2011); Matusick v. Erie Cnty. Water Auth., 757 F.3d 31, 62 (2d Cir. 2014).  In other words, a plaintiff must show a "direct causal link" between "an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker," and the alleged constitutional violation.  City of Canton v. Harris, 489 U.S. 378, 385 (1989); City of Oklahoma v. Tuttle, 471 U.S. 808, 823–24 (1985).

In their Amended Complaint, the plaintiffs allege that the plaintiff's injuries were inflicted, at least in part, "by the City of Waterbury's policy or custom of failing to respect the First Amendment rights of protesters." Am. Compl. at 7-8.  However, at the summary judgment stage, the plaintiffs have not identified a specific city policy that they allege caused the plaintiffs' arrests, nor introduced any evidence to show how such a policy caused the plaintiffs' injuries. Instead, the plaintiffs rely on an interrogatory response by the defendants, in which the defendants claimed that Ms. Legree's arrest was "in compliance with policies, procedures, and customs of the City of Waterbury." Pl.'s Opp. at 8, Interrogatory Responses. The plaintiffs argue that, if unconstitutional arrests complied with the City of Waterbury's policies and customs, then the police must be acting in accordance with an unconstitutional policy or custom.  Pl.'s Opp at 8.  The court is not persuaded.

"Demonstrating that the municipality itself caused or is implicated in the constitutional violation is the touchstone of establishing that a municipality can be held liable for unconstitutional actions taken by municipal employees." Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 125 (2d Cir. 2004). At this stage, one conclusory interrogatory response does not suffice to create a genuine issue of material fact over whether an unnamed and unidentified policy was the cause of the arrests.[10] To meet their burden, plaintiffs must identify a specific policy and come forward with evidence sufficient to show a causal link between the policy and the action. See Appletree v. City of Hartford, 555 F. Supp. 224, 228 (D. Conn. 1983) (holding a complaint against a municipality must fail if it "appears to have merely attached a conclusory allegation of 'policy' to what is in essence a claim based on a single unconstitutional act.")

Nor have plaintiffs introduced evidence that city officials had a custom or practice of making unconstitutional arrests. Aside from passing references to other arrests that took place that day, the plaintiffs have not described a pattern or practice of unconstitutional arrests. Finally, the plaintiffs have failed come forward with any evidence that a senior policymaker for the City of Waterbury ratified the officers' actions. The plaintiffs' reliance on Amnesty Am. v. Town of W. Hartford, 361 F.3d 113 (2d Cir. 2004) is misplaced. In Amnesty America, the court held that "when a subordinate municipal official is alleged to have committed the constitutional violation, municipal liability turns on the plaintiffs' ability to attribute the subordinates' conduct to the actions or omissions of higher ranking officials with policymaking authority." Id. at 126. Here,

---

[10] Furthermore, this interrogatory response reflects the defendants' position that the arrests were lawful. Though defendants may use interrogatory responses as evidence, see fn. 6, supra, it alone does not create a material issue of fact as to a particular policy, adopted by an unidentified policymaker, involved in the plaintiffs' arrests.

the plaintiffs have not come forward with admissible evidence on which a jury could find

that the events of May 31, 2020, were attributable to the acts or omissions of anyone

higher ranking than Captain Gilmore. Nor have they shown that Captain Gilmore has

"policymaking authority." See id.

Because the plaintiffs have failed to identify a specific policy or custom of the City

of Waterbury of unconstitutional arrests, or the policymaker, the defendants' Motion for

Summary Judgment with respect to Count Five is granted.

      F.    Municipal Liability Claim

The Amended Complaint alleges a municipal negligence claim pursuant to

section 52-557n of the Connecticut General Statues. Am. Compl. at 7. The defendants

argue that this claim must be dismissed because governmental immunity applies.

Def.'s Mem. at 38.

Section 52-557n(a)(1) provides that, "except as otherwise provided by law, a

political subdivision of the state shall be liable for damages to person or property

caused by . . . [t]he negligent acts or omissions of such political subdivision or any

employee, officer or agent thereof acting within the scope of his employment or official

duties. . . ." However, the statute creates two exceptions: one for acts which "constitute

criminal conduct, fraud, actual malice or wilful misconduct;" and another exception for

actions which "require the exercise of judgment or discretion as an official function of

the authority expressly or impliedly granted by law." Conn. Gen. Stat. § 52-557n(a)(2).

In their Memorandum, the defendants argue that they were engaged in

discretionary acts, so the City is therefore immune from suit under section 52-

557n(a)(2). Def.'s Mem. at 38. The court agrees.

Under Connecticut law, discretionary immunity "reflects a value judgment that—despite injury to a member of the public—the broader interest in having government officials and employees free to exercise judgment and discretion in their official functions, unhampered by fear of second-guessing and retaliatory lawsuits, outweighs the benefits to be had from imposing liability for that injury."  Ventura v. Town of E. Haven, 330 Conn. 613, 630, (2019).  Indeed, Connecticut courts have long recognized that, as a general rule, "[p]olice officers are protected by discretionary act immunity when they perform the typical functions of a police officer."  Smart v. Corbitt, 126 Conn. App. 788, 800 (2011).

To demonstrate that an action is "ministerial" as opposed to discretionary, "a plaintiff ordinarily must point to some statute, city charter provision, ordinance, regulation, rule, policy, or other directive that, by its clear language, compels a municipal employee to act in a prescribed manner, without the exercise of judgment or discretion."  Ventura v. Town of E. Haven, 330 Conn. 613 at 630, see also Violano v. Fernandez, 280 Conn. 310, 323 (2006).  In the present case, the plaintiffs have not identified any directive that renders the police activity ministerial rather than discretionary.  As a result, the court will apply the general rule under Connecticut law that the typical acts of police officers, here conducting arrests, fall under the umbrella of a municipality's discretionary act immunity.

In their Amended Complaint, the plaintiffs claim that "discretionary act immunity will not apply because [the defendants'] actions lacked probable cause and were done for a reason other than for the purpose of bringing perpetrators of crime to justice, or in other words, the defendants' actions were wanton and malicious."  Am. Compl. at 8.  In

their opposition, the plaintiffs claim that, because the arrests inferably took place with "malice, wantonness, or [an] intent to injure", they fall under an exception to discretionary immunity.  Pl.'s Opp. at 9.

However, the plaintiffs' argument relies on a misreading of section 52-557n(a)(2). Under the malice exception, a "political subdivision of the state shall <u>not</u> be liable" for "[a]cts or omissions of any employee, officer or agent which constitute[s] . . . malice (emphasis added)."  Conn. Gen. Stat. § 52-557n(a)(2).  Therefore, malice on the part of individual defendants would render the city <u>immune</u> from liability. <u>See</u> <u>Richardson v.</u> <u>McMahon</u>, No. 22-582, 2023 WL 3102910, at *2 (2d Cir. Apr. 27, 2023). "If we were to find that the [defendant police officers] acted with malice by, for example, arresting [the plaintiff] without probable cause, the City would <u>not</u> be liable (emphasis added)."  <u>Id.</u> Therefore, if the plaintiffs are correct that the defendant officers acted with malice, wantonness, or an intent to injure, then their claim falls under an exception to municipal liability in § 52-557n(a)(2).  Even if they are not correct, the court concludes the actions are covered by discretionary act immunity.

Because the police officers described in the Amended Complaint were acting pursuant to their discretion, summary judgment with respect to the plaintiff's municipal liability claim in Count Six is granted.

## V.   CONCLUSION

For the reasons stated above, the defendants' Motion for Summary Judgment (Doc. No. 39) is granted in part and denied in part.  The Motion is granted as to Count One, Count Two, and all of the plaintiffs' other claims against Officer John Doe; granted as to Count Five and Count Six against the City of Waterbury; granted as to Count Four,

Count Eight, and Count Nine with respect to all defendants. The Motion is denied as to

Count Three and Count Seven against Captain Gilmore and Officer Terni.  The Clerk is

directed to terminate Officer John Doe and the City of Waterbury as defendants in this

case.


**SO ORDERED.**

       Dated at New Haven, Connecticut this 28th of August 2024.


                                        /s/ Janet C. Hall
                                      Janet C. Hall
                                      United States District Judge